# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **CLEMENT DALE ALEXANDER** | * | **CIVIL ACTION NO. 06-1694** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Clement Dale Alexander, born September 23, 1952, filed an application for a period of disability and disability benefits on July 16, 1993, alleging an onset date of July 1, 1992.  After a hearing before an Administrative Law Judge ("ALJ"), claimant was awarded disability insurance benefits on October 27, 1995, based on a finding that his flat feet and mental impairments precluded his performing substantial gainful activity.  (Tr. 23-31).

On continuing disability review, Disability Determinations Service determined that medical improvement had occurred, and that claimant's disability ceased as of July 1, 2004.  (Tr. 21-22).  After denial of his appeal at the administrative level, claimant filed for judicial review with this Court.

<u>FINDINGS AND CONCLUSIONS</u>

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:[1]

**(1) Report from Dr. Sam H. Benbow dated January 16, 1999**.  Claimant stated that he drank at least one six-pack of beer daily.  (Tr. 180).  On examination, he was depressed and distant.  He got up on three different occasions with tears on his face.  His affect was restricted.  Judgment and insight appeared fairly good.

Dr. Benbow stated that claimant appeared to be responding to extremely difficult environmental events, including his marriage and "Gulf War syndrome." (Tr. 181).   He had developed a major depression, which interfered with his interpersonal relationships, interest and activity levels, and pace and concentration to a severe degree.  He concluded that claimant's depression would continue as long as the syndrome existed, and that he would remain severely impaired.  The diagnostic

_____

[1]Although all of the records were reviewed by the undersigned, only these relating to the cessation of benefits are summarized herein.  The comparison point decision is May 24, 1999. (Tr. 15, 365).

2

impression was major depression, single episode, severe, and Gulf War syndrome. Claimant was judged competent to manage his own affairs.

**(2) Report by Dr. Glennal Verbois dated May 18, 1999**.   Claimant complained of chronic low back pain on the right, bilateral knee pain greater on the right, and bilateral foot pain.  (Tr. 183).  He was status-post a low back  injury he sustained while lifting weights in the military in the early 1980s, and a right clavicle injury sustained in a motor vehicle accident on September 3, 1998.  He also reported having flat feet and heel spurs.

Claimant reported that he smoked one pack of cigars and drank a six-pack of alcohol daily.  (Tr. 184).  He stated that he had lost 90 pounds over the previous two years.  He also complained of daily sinus headaches, coughing and shortness of breath, and intermittent indigestion.

On examination, claimant was 6 feet 2 inches tall, and weighed 194 pounds. His blood pressure was 112/78.  He was alert and oriented times four.

Heart had regular rate and rhythm, and lungs were clear.  Extremities had no edema or atrophy.  Range of motion was within functional limits.

The knees had crepitus with range of motion, but no redness, warmth, or effusion.  Claimant had no instability.  He had good range of motion.

Claimant's muscle strength was 5/5.  (Tr. 185).  Sensation was intact.  He was able to stand on his heels and toes.

Right hip range of motion was normal, and left ROM resulted in knee pain. Claimant had negative straight leg raising.  Deep tendon reflexes were normal.  Gait was non-antalgic.

Lumbosacral x-rays revealed small spurs at L3, 4, and 5.  The lumbosacral space was slightly narrowed.  Knee x-rays showed a very small spur at the medial border of the tibial plateau.

Dr. Verbois' impression was that claimant had some very mild degenerative lumbar changes, which would be expected for his age.  He had good range of motion in the lumbar spine, but had to take his time because of pain.  He also apparently had plantar fasciitis bilaterally, which apparently had responded in the past to cortisone injections and orthotics in his shoes.

Claimant was able to see, hear, and communicate effectively.  (Tr. 186).  He did not ambulate with an assistive device.  He was able to handle and feel things.

Dr. Verbois opined that claimant might have difficulty with activities like repetitive stair climbing or very prolonged standing or walking.  He found that claimant was able to sit without difficultly.  He stated that claimant should be able to lift and carry moderate loads without difficulty.

4

**(3) Records from Doctors Hospital of Opelousas dated September 3, 1998 to August 22, 2003**.  On September 3, 1998, claimant complained of left chest wall pain after being involved in a motor vehicle accident.  (Tr. 209).  He had alcohol on his breath, and indicated that he had comsumed a beer.  The impression was a contusion of the left upper chest area.  X-rays of the shoulder were normal.  (Tr. 205).

On February 11, 2003, claimant complained of intermittent left frontal headaches for one week.  (Tr. 201).  A CT scan of the brain was negative.  (Tr. 203).  The impression was a cluster headache.  (Tr. 200).

On April 4, 2003, claimant complained of swelling to the left knee.  (Tr. 197).  His knee was evacuated.  (Tr. 196).

On August 22, 2003, claimant complained of a left shoulder and right hip injury with pain.  (Tr. 191).  X-rays were normal.  (Tr. 192-93).

**(4) Records from Metoyer Family Medical Center dated January 23, 2003 to March 22, 2004**.  Claimant was seen for chronic low back pain with radiculopathy, pain and swelling to the right elbow, left knee pain and swelling, sinus congestion, and pain and swelling to the left ankle.  (Tr. 211-19).  He was prescribed Lortab and Ultracet.  (Tr. 211, 213-15, 18-19).

**(5) Consultative Psychological Evaluation by Sandra B. Durdin, Ph.D. dated May 11, 2004**.  On examination, claimant's eyes were "somewhat blood shot

looking," and he smelled of alcohol. (Tr. 220-21). He was polite, but emotional. (Tr. 221). He remained angry about the service, war, and combat.

Claimant was not receiving any mental health services, and had not had any treatment for substance abuse. He complained of a long history of depression and of hard liquor. He had reduced his alcohol consumption to a six-pack of beer a day, and drank on average three beers and a glass of wine daily.

On evaluation, claimant was alert and full oriented. He had fairly well-sustained attention and concentration, but was very preoccupied with war experiences. He was moderately depressed and emotional relative to past experiences. He had fair short-term memory, and normal immediate and remote memory. He had average reasoning capacity.

Claimant handled funds. He had an adequate fund of knowledge. He had no evidence of psychosis. He had no immediate homicidal or suicidal ideation or intent. He actively abused alcohol.

Claimant was moderately depressed, and became emotional when talking about war experiences. (Tr. 222). He did not function in the severe depressed range in ordinary life on medication. Dr. Durdin noted that there might be exacerbation of depression with alcohol dependence. He had some narcissistic personality disorder features.

6

Dr. Durdin's impression was depressive disorder, NOS, chronic alcohol dependence, narcissistic personality disorder traits, and leg, back, and stomach problems by report.  She determined that claimant had the ability to understand, recall, and carry out simple, repetitive tasks.  He had the ability to comprehend more complex tasks, but his short-term memory might vary.  He could sustain attention for two-hour blocks of time if tasks were repetitive.  He could get along with others, but was selective about associations.  He was maintaining a long-term relationship.

Claimant had fair ability to withstand ordinary routine pressures and demands. He could and did handle money.  His ability to sustain effort over a 40-hour work week was fair from a mental standpoint.

**(6) Psychiatric Review Technique dated July 19, 2004**.  Joseph K. Kahler, Ph.D., evaluated claimant for affective, personality, and substance addiction disorders. (Tr. 224).  He found that claimant had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 234).  He had no episodes of decompensation.   Dr. Kahler determined that significant medical improvement had occurred since the comparison point decision, and that claimant appeared to be capable of simple work.  (Tr. 236).

**(7) Residual Functional Capacity Assessment – Mental dated July 19, 2004**.

Dr. Kahler determined that claimant was moderately limited as to his ability to understand, remember, and carry out detailed instructions; maintain attention and concentrate for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal work day and workweek without interruptions and perform at a consistent pace, and accept instructions and respond appropriately to criticism from supervisors.  (Tr. 237-38).  He was not significantly limited in any other area.

**(8) Records from VA Medical Center-Alexandria dated September 10, 2002 through July 18, 2005**.  On September 10, 2002, claimant was admitted for alcohol dependence, alcohol-induced mood disorder, and depressive disorder.  (Tr. 295).  His prognosis was good, as long as he followed the out-patient plan.

Right ankle and feet x-rays dated September 29, 2003 showed a minor abnormality.  (Tr. 272, 275-76).  Left ankle and bilateral knee x-rays were normal. (Tr. 273-74).  Cervical spine views showed mild degenerative changes.  (Tr. 273).

On January 7, 2004, claimant was seen for arthritis/back pain and reflux.  (Tr. 291-92).  An alcohol screening test was positive.  (Tr. 294).  He was prescribed Ultram for pain, and lifestyle modifications for reflux.  (Tr. 292).  His pain was relieved by medications.  (Tr. 290).

8

On November 23, 2004, the VA issued a disability rating of 10 percent for his chondromalacia of the right knee, 10 percent for patellofemoral pain syndrome of the left knee, 20 percent for chronic lumbosacral strain and questionable fracture of the right transverse process at L3, 10 percent for bilateral pes planus with plantar fasciitis, and 0 percent disabling for right ankle fracture. (Tr. 244). His claims for service connection for posttraumatic stress disorder and service connection for bronchitis were denied.

On November 30, 2004, claimant complained that his eyes were getting a little worse. (Tr. 313). His vision without glasses was 20/20-2. The assessment was suspected glaucoma. (Tr. 312).

On February 16, 2005, claimant was seen for back pain, reflux, joint pain, and depression. (Tr. 310). The assessment was back pain and arthritis, stable; reflux, stable; hypercholesterolemia; depression, stable, and anemia, improved.

On July 18, 2005, claimant complained of chronic pain in the shoulders. (Tr. 307). He was out of Lortab. He had depressed mood secondary to depression. He declined referral to the tobacco cessation program. (Tr. 308). The assessment was back pain, controlled with pain medication; positive shoulder spasms; depression, for which Zoloft was increased; reflux, arthritis, and hypercholesterolemia. (Tr. 306).

**(9) Records from Doctors' Hospital of Opelousas dated May 26, 2004 to October 18, 2005**.  On October 18, 2005, claimant complained of right shoulder pain for three months.  (Tr. 318).  The diagnosis was bursitis.  (Tr. 316, 322).  He was prescribed a Medrol Dose Pack and Vicodin.  (Tr. 319).

**(10) Claimant's Administrative Hearing Testimony**.   At the hearing on October 12, 2005, claimant was unrepresented.  The ALJ asked him whether he had decided to proceed without a lawyer, to which he agreed.  (Tr. 331).  He also signed a waiver of representation.  (Tr. 332).

Claimant was wearing sunglasses, which he testified were for glaucoma.  (Tr. 329).  He complained of arthritis in his knees, for which he took Diclofenac and Misoprostol.  (Tr. 340-41).  He also took Cyclobenzaprine for his right shoulder, Hydrocodone for back pain three times a day, and Brimonidine for glaucoma.  (Tr. 342, 345-46).

Additionally, claimant had flat feet and bone spurs.  (Tr. 348).  He complained of sinus headaches.  (Tr. 356).  He also reported depression, for which he took medication.  (Tr. 357-58).

Claimant testified that he was in the Army for 21 years.  (Tr. 348).  He stated that he was in personnel administration.  (Tr. 349).  He had graduated from high school, and had attended college for two years.  (Tr. 351).  After the Army, he went

to nursing school for three years, but was unable to focus.  (Tr. 352).

Regarding restrictions, claimant testified that he could lift 10 pounds.  (Tr. 359).  He stated that he could stand for about five minutes, and walk two or three blocks before he had an electrical shock sensation down his leg.  (Tr. 360).  He could sit for quite some time, but had to keep shifting his body.

Claimant stated that he still drank a beer on Saturdays or Sundays while watching sports.  (Tr. 361-62).  He also complained of a cracked bone in his ankle that was floating.  (Tr. 363).  Additionally, he reported a cracked disc in his back, diarrhea, sleeplessness, bad dreams about Desert Storm, arthritis in his elbow, sinus problems, erectile dysfunction, and acid reflux.  (Tr. 364).

**(11) Administrative Hearing Testimony of Jimmy Cole, Medical Expert ("ME")**.  Dr. Cole testified that claimant had evidence of medical improvement since May 24, 1999.  (Tr. 365).  He summarized that claimant had been diagnosed with major depression and Gulf War syndrome in 1999, and alcohol dependence and depression in 2002.  (Tr. 365-66).  However, he noted that claimant had been given a Global Assessment of Functioning score of 70 in 2002, which meant that he had mild symptoms and some difficulty in social occupational work to function, but was generally functioning pretty well.  (Tr. 366).

11

Dr. Cole also observed that claimant had received very little mental health treatment from the VA, and that his Zoloft had been decreased.  He also cited Dr. Durdin's finding that even with claimant's drinking, his reasoning, fundamental knowledge, and intellectual issues were doing well.  (Tr. 369).  He further noted Dr. Durdin's observation that claimant could sustain attention for two-hour blocks of time if tasks were repetitive, and could get along with others, but was selective about associations.  He also referenced claimant's VA records from November, 2004 indicating that claimant's claim for posttraumatic stress disorder had been denied. He concluded that claimant did not meet or equal the listing for a mental impairment. (Tr. 371).

**(12) Administrative Hearing Testimony of Harris Rowzie, Vocational Expert ("VE")**.  The ALJ posed a hypothetical in which he assumed a 53-year-old claimant, who had 18-plus years of education; could lift 20 pounds occasionally and 10 pounds frequently; could stand, walk and sit for 6 out of 8 hours; could do only limited kneeling, squatting, crawling, climbing, and crouching; could not climb ropes or scaffolds; could not work at heights, and could not be exposed to any dust, fumes, smoke, or extreme temperatures.  (Tr. 374).  In response, Mr. Rowzie testified that claimant could do his past work as a personnel clerk, of which there were 588 positions statewide and 35,222 nationally.  (Tr. 375).  When the ALJ added the

limitation of no overhead work with the right arm or right hand, the VE stated that the answer would not change.  (Tr. 376).

Claimant asked the VE whether he could work if his medication caused drowsiness and sleepiness.  (Tr. 376).  At that point, the ALJ changed the hypothetical to assume that claimant became drowsy from medications, which limited concentration, persistence and pace so that he could concentrate only in two-hour blocks of time, could not drive a car, and had to take public transportation.  (Tr. 376). In response, Mr. Rowzie testified that it would reduce the occupational base by 5 percent.

**(13) The ALJ's Findings**.  Claimant argues that: (1) the ALJ erred in assessing his residual functional capacity; (2) the ALJ erred in finding that his benefits were properly ceased, as he relied upon the testimony of the vocational expert given in response to a defective hypothetical question, and (3) the testimony of the VE should result in a finding that claimant continued to be disabled.  Because I find that the ALJ posed a defective hypothetical to the vocational expert by failing to include claimant's mental limitations, I recommend that this case be **REMANDED** for further proceedings.

Claimant argues that the ALJ improperly failed to include significant non-exertional mental limitations in his hypotheticals to the vocational expert. [rec. doc.

8, p. 7].  The ALJ found that claimant had the RFC for the ability to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally; the inability to sit, stand, or walk for more than a total of 6 hours in an 8-hour workday; the inability to do any kneeling, crawling, squatting, crouching, or climbing; the need to avoid exposure to dust, fumes, or temperature extremes, and the inability to perform overhead work with the right arm or hand.  (Tr. 17).  However, despite claimant's long-standing history of depression (Tr. 181, 222, 224, 237-38, 295), the ALJ found no mental limitations whatsoever.

At the hearing, the ALJ posed a hypothetical with physical limitations only. (Tr. 374).  In response to claimant's question regarding the availability of jobs for people with medication side effects, the ALJ added "drowsiness from taking the medication" as a non-exertional limitation.  (Tr. 376).  However, the ALJ did not add any limitations due to claimant's mental conditions.

The record reflects that claimant was diagnosed by the consultative examiner, Dr. Benbow, with a severe, major depression in 1999.  (Tr. 181).  In a subsequent consultative examination in 2004, Dr. Durdin assessed claimant with depressive disorder, NOS, chronic alcohol dependence, and narcissistic personality disorder traits.  (Tr. 222).  She determined that claimant had limitations from his mental conditions, including varied short-term memory, selectiveness about associations,

"fair" ability to withstand ordinary routine pressures and demands, and "fair" ability to sustain effort over a 40-hour work week.

The state agency examiner, Dr. Kahler, also found that claimant had limitations due to his mental disorders, including "moderate" limitations as to his ability to understand, remember, and carry out detailed instructions; maintain attention and concentrate for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday and workweek without interruptions and perform at a consistent pace, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 237-38).  Additionally, the latest records from the VA indicate that claimant had "altered though processes R/T depressed mood secondary to depression."  (Tr. 307).

Based on claimant's limitations from his mental conditions, the ALJ's hypothetical cannot be said to "incorporate reasonably all disabilities of the claimant recognized by the ALJ." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).   Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to obtain a consultative evaluation of claimant's mental

impairments, and pose a proper hypothetical to a vocational expert, if needed. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  *See, Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN**

**AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed October 5, 2007 at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

17